William J. BARNES, Petitioner,

v.

Michael WENEROWICZ,
et al., Respondents.

Civil Action No. 11–3058.

United States District Court,
E.D. Pennsylvania.

Feb. 7, 2012.

Samuel W. Silver, Bruce P. Merenstein, Schnader Harrison Segal & Lewis LLP, Philadelphia, PA, for Petitioner.

Barry N. Kramer, PA Office of Atty. General, Philadelphia, PA, Chad L. Allensworth, PA Board of Probation & Parole, Harrisburg, PA, for Respondents.

### *REPORT AND RECOMMENDATION*

TIMOTHY R. RICE, United States Magistrate Judge.

Petitioner William J. Barnes, a prisoner at the State Correctional Institution in Graterford, Pennsylvania, filed a counseled petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He challenges the March 22 and October 19, 2011 decisions of the Pennsylvania Board of Probation and Parole ("the Board") denying him reparole.[1]

After careful consideration, I respectfully recommend Barnes' petition be GRANTED, and Barnes be released from custody immediately. A local prosecutor portrays Barnes as a murderer meriting life in prison, but a jury of Barnes' peers acquitted Barnes of murder. The Board's repeated denial of reparole strongly suggests that, like the local prosecutor, the Board seeks nonetheless to punish Barnes for that crime. If due process means anything, it means that the state may not punish an individual for conduct of which he has been acquitted.

Barnes has committed no new crime in more than thirty years, and has been cited for no misconduct while incarcerated in nearly twenty years. His only infraction in the past three decades stemmed from his possession of car keys and a cell phone in 2007

---

1. I permitted discovery, and the parties submitted supplemental briefs and a lengthy stipulated appendix of evidence. I heard oral argument on Barnes' petition on January 31, 2012, and I viewed seven hours of video recordings of two depositions submitted as evidence following that hearing.

without the permission of his parole agent. For that technical parole violation, Barnes has now served almost four-and-one-half years in prison—nearly three times the maximum term suggested by state law, *see* 37 Pa.Code § 75.4 (presumptive sentence range for violation of special parole condition is between three and eighteen months), and more than eight times the term imposed by the Board. Moreover, the Board has precluded him from beginning the lengthy process of seeking reparole for a fifth time until October 2012.

Although Respondents argue the petition should be dismissed without prejudice because Barnes has not first presented his federal substantive due process claim in state court, the United States Court of Appeals for the Third Circuit has held he need not do so. *See DeFoy v. McCullough,* 393 F.3d 439, 445 (3d Cir.2005).

Considering the totality of the unique circumstances presented here, the Board's October 19, 2011 reparole denial was arbitrary, conscience-shocking, and unconstitutional.

### FACTUAL AND PROCEDURAL HISTORY

#### I. *1966–2004: Relevant Criminal History*

In November 1966, two Philadelphia police officers discovered Barnes attempting to break into a business. Vol. I at 53.[2] Barnes shot at the officers and fled. *Id.* One of the officers, Walter Barclay, was hit twice and was paralyzed from the waist down. *Id.* At the time of the shooting, Barnes was on parole following a 1957 robbery conviction.[3] *Id.* Barnes pleaded guilty to assault with

intent to kill and related charges, and was sentenced to a total of ten-to-twenty years incarceration. *Id.* There is no dispute that Officer Barclay and his family suffered devastating pain for the remainder of the officer's life. Nor is there any dispute that Barnes served all twenty years of his sentence, which expired decades ago.[4]

Barnes is currently serving three sentences stemming from events that transpired in the early 1980s. In the summer of 1981, Barnes was arrested twice and charged with robbing two businesses in Philadelphia. *Id.* at 44–46. He pleaded guilty to both robberies and was sentenced to consecutive terms of six-to-fifteen years imprisonment. *Id.* at 44. In November 1981, Barnes was caught attempting to escape from Holmesburg Prison in Philadelphia. *Id.* at 46. He was arrested, convicted of escape and possessing weapons or implements for escape, and sentenced to five-and-one-half-to-twelve years imprisonment, to run consecutively to his existing robbery sentences. *Id.* at 44. The aggregate of his sentences, therefore, was seventeen-and-one-half-to-forty-two years. *Id.*

After his 1981 arrests, Barnes spent more than twenty-five years in jail. He attempted to escape in 1984, 1986, and 1988. *Id.* at 64. In 1993, he was found to possess contraband, including items that might be considered implements of escape. *Id.* In the nineteen years since 1993, however, Barnes has made no further escape attempts, nor has he been cited for any other prison misconduct. *Id.*

#### II. *2004–2007: Parole Granted*

Six decisions by the Board are relevant to understanding Barnes' habeas claim. The

---

2. The record in this case consists of a two-volume appendix submitted by Barnes with his post-discovery memorandum of law in support of his habeas petition, as well as two videotapes of depositions conducted in this matter. The first volume of the appendix contains copies of documents from Barnes' parole file, which are Bates stamped with page numbers starting with the prefix "PBPP." I will cite to those documents as "Vol. I at ——," using the page number but omitting the "PBPP" prefix. The second volume contains copies of deposition transcripts and various other exhibits, each preceded by a numbered tab. I will cite to those exhibits as "Vol. II at Tab__, p.__."

3. The 1957 robbery was not Barnes' first criminal conviction, nor was the 1966 shooting his first direct parole violation. Barnes was convicted of robbery in 1955 as well, and committed the 1957 robbery within months of being paroled. *See* Vol. I at 53. Also, while in custody awaiting disposition of the charges arising from the 1966 shooting, Barnes stabbed another inmate. *Id.* In 1969 and again in 1974, Barnes was charged with, and pleaded guilty to, escaping from custody. *Id.* at 54.

4. A prosecutor, however, falsely told the Board in November 2010 that Barnes had not yet completed his sentence for shooting Officer Barclay. Vol. I at 239–40.

first was in 2004. Although the Board sent letters seeking parole recommendations to the Philadelphia District Attorney's Office and the two judges who sentenced Barnes in his 1981 robbery cases, none of the recipients responded. *See id.* at 691–96. The superintendent of the prison where Barnes was housed at the time recommended, on behalf of the Department of Corrections ("DOC"), that Barnes be paroled.[5] *Id.* at 411.

A psychological evaluation prepared in anticipation of the 2004 decision noted Barnes' pursuit of "negative behaviors" had been curtailed by age and physical limitations.[6] *Id.* at 540. The evaluator described Barnes as "detached" and "manipulative," said he "spoke candidly" about his past, noted he "did not exhibit any remorse for his behavior," and speculated that "elements of his criminal thinking may still be present." *Id.* at 540–41. A 2004 Level of Service Inventory–Revised ("LSI–R")—a tool used by the Board to assess a potential parolee's level of risk and supervision needs—placed Barnes at the highest end of the "high-medium" risk classification, with a score of 36. *Id.* at 550. Nonetheless, the Board's Parole Decision Making Guidelines ("parole guidelines") recommended parole was "likely," based on Barnes' score of 6. *Id.* at 249.

Notes from Barnes' March 2004 parole interview concluded: "Appropriate interview and adjustment by an elderly man. Accepts responsibility and demonstrates obvious remorse. Panel agrees with DOC and guidelines." *Id.* at 250. On April 2, 2004, the Board issued a decision granting Barnes parole, effective June 12, 2004, for the following reasons:

- His "acceptance of responsibility for the offense(s) committed";

- "The recommendation made by the Department of Corrections";

- His "participation in and completion of prescribed institutional programs"; and

- His "reported institutional behavior."

*Id.* at 639.

In June 2004, however, an error in calculating Barnes' minimum release date was discovered, and the Board rescinded its decision to grant parole. *Id.* at 638. The Board noted Barnes should be processed for parole "when eligible on new minimum." *Id.*

From July 2005 until June 2006, Barnes "participated in pre-release" and was permitted to reside in a community correctional center ("CCC") in Philadelphia. *Id.* at 307. While at the CCC, Barnes worked at a Shop Rite supermarket, performed community service at Eastern State Penitentiary, and spoke about his past to students at Temple University. *Id.* at 555–58; *see id.* at 371–72; *see also id.* at 432 (noting "satisfactory adjustment" at CCC). Barnes was returned to prison, however, after he suffered a series of heart attacks and required medical care that could not be provided at the CCC. *Id.* at 46, 274, 307.

The second relevant parole decision occurred when Barnes reached his recalculated minimum release date in early 2007. The Board again solicited input from the prosecutors and judges associated with the sentences he was then serving. *Id.* at 684–90. Although no representative from the Philadelphia District Attorney's Office responded, the President Judge of Philadelphia's Court of Common Pleas sent a letter in which he declined to make a recommendation. *Id.* at 702. Barnes again received the DOC's recommendation for parole, including the recommendation of the prison's superintendent. *Id.* at 309 (noting "good adjustment [and] attitude" and "did well [at] CCC"); *see id.* at 270. The DOC recommended parole despite its own assignment of an institutional code for Barnes based on his history of escape ("H-code").[7] *See id.* at 305.

---

5. From 2004 until his parole in April 2007, and from the time his parole was revoked in late 2007 through 2009, Barnes was incarcerated at the State Correctional Institution in Greene County, Pennsylvania. Vol. I at 270, 361, 411, 443. Before his trial in Philadelphia, Barnes was moved to the State Correctional Institution in Graterford, Pennsylvania, where he remains today. *Id.* at 237.

6. Barnes was 67 years old at the time. Vol. I at 541.

7. Barnes was also assigned a code based on the need to house him in a single cell ("Z-code"). Vol. I at 305. Both the H- and Z-code designations were later cited by the DOC and Respondents as a basis for denying Barnes parole. *See id.* at 26, 163. Because the Z-code designation

A 2006 psychological evaluation described Barnes as "direct and cooperative," and stated he spoke of his offenses "casually and without remorse," in a "matter-of-fact manner." *Id.* at 277. It noted Barnes "takes full responsibility for all of his criminal acts" and "is genuinely interested in keeping his behavior within the confines of the law." *Id.* The report concluded Barnes' risk of recidivism was reduced based on his age, his recent adjustment, his potential job, his participation in Alcoholics Anonymous, and his family support. *Id.* at 278. Barnes' score on a 2006 LSI–R was 33, which placed him in the high risk category. *Id.* at 280. As in 2004, the parole guidelines "suggest[ed] parole" based on Barnes' score of 6.[8] *Id.* at 258.

Parole interview notes from January 22, 2007 mentioned Barnes' health problems and described a "[g]ood interview with [an] elderly man with violent past [history] in his earlier years. Good insight demonstrated. Articulate, expressive, candid. No evasiveness or minimization noted." *Id.* at 259–60. The Board issued its second decision granting Barnes parole on April 10, 2007, citing the following reasons:

- His "acceptance of responsibility for the offense(s) committed";
- His "stated remorse for the offense(s) committed";
- "The positive recommendation made by the Department of Corrections";
- His "participation in and completion of prescribed institutional programs";
- His "reported institutional behavior";
- His "development of an approved release plan"; and

- His "interview with the hearing examiner and/or board member."

*Id.* at 320. Barnes' parole was subject to numerous "special conditions," including a stipulation that he not drive a car without registration, insurance, a license, and his parole officer's permission. *Id.* at 321. Although none of the special conditions prohibited Barnes from possessing a cell phone, *see id.*, additional conditions were apparently implemented at the CCC to which Barnes was released, including a cell phone restriction, *id.* at 763.

Upon his release, Barnes returned to his job as a janitor at a Shop Rite supermarket in Philadelphia. *Id.* at 445.

In August 2007, Officer Barclay, the victim in Barnes' 1966 shooting, died. *See id.* at 245; *see also id.* at 730 (offense date for murder charge was August 19, 2007).

III. *2007–2009: Parole Revoked, Reparole Denied*

Barnes was arrested and charged with murder in late August 2007. *See id.* at 267–69, 418, 722–30. At the time of his arrest, he possessed a cell phone and car keys. *Id.* at 267, 718. He promptly waived a hearing and admitted to the technical violations of his parole,[9] *id.* at 268–69, and the Board determined he should serve six months in custody for the violations, *id.* at 336. The Board instructed Barnes to "have no misconducts" and to "participate in [a] Thinking for a Change [program]," and set a review date of February 2008. *Id.*

As promised, the Board reviewed Barnes for reparole in early 2008. No recommendations were solicited from any judges or pros-

---

was based on Barnes' medical history, *id.* at 27.1, however, counsel for Respondents conceded at oral argument that Barnes' Z-code would be an invalid basis for a parole denial.

8. The guidelines appeared to assign Barnes a score of 11 and recommend parole refusal. Vol. I at 258, 270. However, his interviewer noted 5 points had been improperly added based on Barnes' "CCC failure," which ignored the fact he had been removed from the CCC due to health concerns, and not based on his conduct. *Id.* at 258.

9. At various times since his parole was revoked, Barnes has explained he possessed a cell phone

because he feared he might have a heart attack while alone, and he wanted to ensure he would be able to contact help should that happen. *See, e.g.,* Vol. I at 49. He further explained his sister had given him a car, which he had recently registered and insured, and he had planned to take all necessary documentation to his parole agent and obtain permission to drive the day after his arrest. *See id.* at 268–69. One of Barnes' interviewers for his October 2011 reparole review conceded she had no reason to doubt Barnes' explanations. Vol. II at Tab 4, pp. 58–65.

ecutors, and none were provided. This time, the DOC voted against reparole, citing the pending murder charge and noting Barnes had not yet completed the "Thinking for a Change" program. *Id.* at 457–58; *see id.* at 402 (noting Barnes was on a waiting list for the program and would begin it in February 2008).

The record contains no updated psychological evaluation related to the 2008 parole decision. Barnes' score on an October 2007 LSI–R was 26, which corresponded to a medium risk level and was lower than his two previous LSI–R scores, which had resulted in his parole. *Id.* at 463. In March 2008, the parole guidelines "suggest[ed] parole refusal," based on Barnes' score of 8.[10] *Id.* at 655. Barnes' guidelines score had increased despite the decrease in his LSI–R score because he had not completed "Thinking for a Change." *Id.*

Barnes' March 2008 parole interviewer noted Barnes was "candid" and had "[g]ood insight and understanding with regard to instant offense." *Id.* at 656. During the interview, Barnes admitted he was a "career criminal with no moral character," but reported "he turned [him]self around," an assessment that "appear[ed] warranted" to the interviewer. *Id.* Despite these favorable observations, the Board understandably denied reparole on April 3, 2008 for the following reasons:

- "The negative recommendation made by the Department of Corrections";
- Barnes' "need to . . . complete additional institutional programs"; and
- Barnes' pending murder charge.

*Id.* at 334. The Board decided Barnes would be reviewed again in March 2009, "or earlier, if recommended by the DOC, or criminal murder charges are disposed." [11] *Id.* The Board advised Barnes it would consider the following factors at his next review: (1) whether he completed "Thinking for a Change"; (2) whether the DOC recom-

mended parole; and (3) whether Barnes "maintained a clear conduct record." *Id.*

Barnes fully complied. On July 29, 2008, he completed "Thinking for a Change." *Id.* at 383. On January 21, 2009, the DOC voted to recommend reparole "pending disposition of open [murder] charges." *Id.* at 399. And a 2009 Re–Parole Review Summary confirms Barnes had remained misconduct-free. *Id.* at 432. Moreover, Barnes received his lowest score yet—a 17—on a January 2009 LSI–R, meriting a low risk classification. *Id.* at 385. An Offender Violence Risk Typology ("OVRT") assessment, however, categorized Barnes as "high risk" and recommended a "violence prevention booster." [12] *Id.* at 663. Nonetheless, the parole guidelines suggested reparole in 2009 based on Barnes' score of 4. *Id.* at 203.1.

A psychological evaluation conducted in January 2009 described Barnes as "calm, cooperative, articulate, open, well-focused, and appropriately interactive," and noted "no evidence of any aggression, hostility, anger, instability, or mental health problems." *Id.* at 166. The evaluator found "no current criminal thinking or antisocial behavior problems," and observed Barnes "expresses regret for his criminal past and impact on victims, and has made positive changes in recent years, although little actual remorse· is expressed." *Id.* In discussing "risk attenuators," the evaluator stated Barnes "[a]ccepts responsibility and indicates responsible lifestyle changes." *Id.*

Although the Board did not seek a recommendation from any prosecutor in advance of its 2009 determination, the assistant district attorney ("ADA") who was prosecuting Barnes for the alleged murder of Officer Barclay sent a letter to the Board in February 2009, before the murder charge went to trial. *See id.* at 96–97. In his letter, the ADA conveyed the Commonwealth's "strenuous[ ] object[ion]" to Barnes' reparole, summarized Barnes' "extensive criminal record,"

---

**10.** Guidelines scores of 7 and higher result in a recommendation of parole refusal. Vol. I at 655.

**11.** On February 27, 2008, after a preliminary hearing, the murder charge was held over for trial. Vol. I at 731.

**12.** There are no documents in the record explaining the basis for the "high risk" assessment on the OVRT.

claimed Barnes "will always be a threat" to the community, and accused Barnes of murdering Officer Barclay.[13] *Id.* at 96. The ADA wrote:

Given this prisoner's extensive criminal record and the many years of suffering he caused Officer Barclay, Barnes should remain behind bars. Given the number of Philadelphia Police Officers recently murdered, it sends the wrong message to the community when individuals like Barnes are released.

*Id.* at 97.

The ADA's sentiments were echoed in contemporaneous letters to the Board from the president of the Philadelphia chapter of the Fraternal Order of Police ("FOP"), and Officer Barclay's sister. *See id.* at 98–99, 244–46. After recounting the events that led to Officer Barclay's shooting and describing the officer's suffering in the years that followed, the FOP's letter asserted: "There is no doubt that William Barnes is responsible for the miserable life and death of Police Officer Walter Barclay. There is an unbroken chain of evidence that was created through medical records that began the moment Officer Barclay was shot." *Id.* at 99. The letter ended with a request that the Board "deny all requests by William Barnes to be released from prison," opining that "there is no repentance that could be acceptable, nor is there any punishment that could be too great for William Barnes." *Id.* The letter from Officer Barclay's sister chronicled the officer's undeniable suffering, accused Barnes of causing the officer's death, and asked the Board to deny reparole.[14] *Id.* at 244–46.

Against this backdrop, Barnes was interviewed by hearing examiner Randolph Parker and Board member Michael Green on March 20, 2009.[15] *Id.* at 204–12. Green's notes from that interview primarily summarized information apparent from Barnes' file regarding his criminal history, parole violations, escape attempts, and pending murder charge.[16] *Id.* at 204. Green's notes concluded as follows: "See no reason to parole, agree [with] ... OVRT ranking. He does what he wants when he wants. He remains a danger to the community.... He needs to serve a longer period of adjustment in prison with violence programming. Noted is that he also faces murder charges." *Id.* at 204–05. Notes taken by Parker during the same interview stated Barnes "has no insight into his behavior and criminal thinking, remains a major concern, shows no remorse for his criminal history, [and] needs [violence prevention] treatment." *Id.* at 674. Parker also noted Barnes "could give no reason" when asked why he should be reparoled, and instead "made lots of excuses and tried to manipulate how well he did on parole." *Id.* at 675. In closing, Parker suggested the Board not review Barnes again for reparole until twenty years later. *Id.* at 677.

On May 28, 2009, the Board denied Barnes reparole for the following reasons:

● His "need to participate in and complete additional institutional programs";

● His "risk and needs assessment indicating [his] level of risk to the community";

● His "prior unsatisfactory parole supervision history";

● "Reports, evaluations and assessments/level of risk indicat[ing his] risk to the community";

● His "failure to demonstrate motivation for success";

● His "minimization of the nature and circumstances of the offense(s) committed";

13. Interestingly, the letter expressed the ADA's personal view, and did not convey a formal position of the DA's Office. *See* Vol. I at 97 (signed by the ADA only, not by or on behalf of the DA). The same is true of the ADA's subsequent letters to the Board. *See id.* at 240, 242.

14. Although the letter is dated February 7, 2009, a review log attached to it in Barnes' file reveals it was reviewed by Board members only in connection with Barnes' most recent request for reparole in October 2011. *See* Vol. I at 243; *see also* Vol. II at Tab 2, p. 150 (victim impact letter

"became available" before October 2011 decision); *id.* at Tab 3, p. 58 (February 2011 interviewer did not review victim impact letter).

15. Green had voted to grant Barnes parole in 2004. Vol. I at 257; Vol. II at Tab 2, p. 11.

16. Because parole interviews are not recorded, the notes of the interviewers are the only contemporaneous record of what transpired. *See* Vol. II at Tab 3, pp. 14–15.

- His "refusal to accept responsibility for the offense(s) committed";
- His "lack of remorse for the offense(s) committed"; and
- His "history of e[s]cape and poor adjustment under supervision."

*Id.* at 332. Based on Green's recommendation, Barnes was informed he would not be reviewed for reparole again until three years later, in April 2012. *Id.* at 333. At that time, the Board informed him, the following factors would be considered: (1) whether he completed a violence prevention program; (2) whether the DOC recommended reparole; (3) whether his conduct record remained clear; (4) whether he completed the DOC's "prescriptive programs," (presumably, the violence prevention program previously referenced); (5) an updated mental health evaluation; and (6) the status of the pending murder charge.[17] *Id.*

### IV. *2010–2011: Post–Trial Reparole Denials*

Barnes' murder trial began on May 17, 2010.[18] *Id.* at 743–44. On May 24, 2010, the jury acquitted him. *Id.* at 745.

Within days of the acquittal, the ADA wrote to the DOC to oppose Barnes' reparole and asked to be notified when Barnes was considered for pre-release or reparole. *Id.* at 242. That letter was promptly forwarded to the Board and the superintendent at Barnes' prison. *Id.* at 241.

Barnes, through counsel,[19] filed an application for parole in June 2010. *Id.* at 93–94. Thereafter, counsel submitted a supporting brief and forwarded to the Board a letter from Project H.O.M.E., a non-profit organization that was willing to hire Barnes if he were released. *Id.* at 101–02; Vol. II at Tab 5. Based on these materials, the Board took

steps to review Barnes for reparole in the spring of 2011.

In advance of that review, on November 17, 2010, the ADA who unsuccessfully prosecuted Barnes for murder wrote a third letter to the Board. Vol. I at 239–40. This time, the ADA summarized Barnes' violent criminal history and shared his subjective belief that Barnes was "acquitted [of Officer Barclay's murder], primarily because of the passage of time and lack of witnesses and medical records." *Id.* at 239. He stated he "came to know William Barnes quite well" while preparing for the murder trial, and claimed Barnes "remains the same vile criminal that he was" decades ago, "despite his outward appearance of a frail, elderly person." *Id.* The ADA falsely asserted Barnes "has yet to serve the full sentence" he received in the 1960s for shooting Officer Barclay, and demanded that Barnes "should spend the rest of his life in prison." *Id.* at 239–40. In closing, the ADA attached an autopsy photograph of Officer Barclay's legs. *Id.* at 240.

On the same day, the president of the FOP also penned a letter to the Board, echoing his objection to Barnes' reparole application. *Id.* at 198–99. His comments focused primarily on Barnes' criminal record and the false premise that, "[w]ithout question," Barnes had not served "the fully prescribed sentence from the burglary and aggravated assaults on Officer Barclay" and, therefore, "still owes society a debt." *Id.* The letter also noted Barnes' technical parole violations, "like any rules violations[,] have a determined set of penalties" which should apply "in full measure" to Barnes.[20] *Id.* at 198.

In December 2010, ten DOC representatives voted to reparole Barnes, some noting

---

**17.** Barnes asked the Board to reconsider its 2009 denial, but the Board refused. *See* Vol. I at 361–83.

**18.** Barnes rejected an offer to plead guilty to third-degree murder, despite the fact that he would have been entitled to credit for the time he had served in connection with the shooting. Vol. II at Tab 7, pp. 9–12. That time nearly equaled the maximum sentence that could have been imposed for third-degree murder. *Id.* at Tab 7, pp. 5–6. Since this information was apparently

not conveyed to the Board, I will consider it only in assessing the ADA's motive for opposing reparole after the trial.

**19.** The same counsel represented Barnes at his murder trial and continues to represent him for purposes of this habeas petition.

**20.** Of course, by this time, Barnes had already served far more than the relevant "determined set of penalties." *See* 37 Pa.Code § 75.4.

he should be reparoled "upon completion of violence prevention." *Id.* at 163. The prison superintendent, however, voted against reparole, citing only Barnes' H-code (escape risk) and the Z-code Respondents now concede was an invalid consideration. *Id.* Notwithstanding the ten "yes" votes, the superintendent's negative vote overrode the others, and the DOC was listed as objecting to parole. *See* Vol. II at Tab 3, p. 48.

A February 2011 LSI–R yielded a score of 23, which fell in the low-medium risk category. Vol. I at 169. Barnes' OVRT score at the same time was 6, corresponding to a medium risk level. *Id.* at 16. The parole guidelines once again suggested reparole, with Barnes' score holding steady at 4. *Id.* at 17. Barnes enrolled in a violence prevention program, although he had not yet finished it when the Board considered his application. *See id.* at 17, 40. Despite the Board's previous direction that a mental health assessment be prepared for Barnes' next review, no new psychological evaluation was performed.

Barnes was interviewed by Board member Green and hearing examiner Audrey Donald on February 9, 2011. *See id.* at 18–25. The only notes taken during that interview were Donald's, which stated: "minimizations of his parole violations and the seriousness of those violations[,] also tends to downplay his past criminal activity[,] uses advanced age as justification for release[,] needs to complete programming[, and] sees self a[s] victim."[21] *Id.* at 18. Although her notes do not reference the ADA's letter, Donald testified she reviewed the letter and considered it in making her decision, describing it as "significant." Vol. II at Tab 3, p. 77. Green also considered the letter, calling it "compelling." *Id.* at Tab 2, p. 152. Green did not consider the motives of the letter's author, *id.* at Tab 2, pp. 156–57, and Donald was not aware the letter was written by the ADA who lost the murder trial, *id.* at Tab 3, p. 77.

On March 22, 2011, the Board denied Barnes' application for reparole, citing:

- His "need to participate in and complete additional institutional programs";
- "The negative recommendation made by the Department of Corrections"; and
- His "prior unsatisfactory parole supervision history."

Vol. I at 14. Donald recommended Barnes be reviewed again for reparole in August 2011, because she believed that "would give him ample time to complete the Violence Prevention [program]." Vol. II at Tab 3, p. 146; *see* Vol. I at 14. Barnes was informed that the following considerations would impact his next review: (1) whether he had completed the violence prevention program; (2) whether the DOC recommended reparole; and (3) his conduct record. Vol. I at 14.

Once again, Barnes complied. First, he completed a program entitled "Violence Prevention High Intensity" in April 2011. *Id.* at 77–79. Second, his attorney contacted the prison superintendent asking what steps Barnes could take to ensure he received the DOC's recommendation for reparole. Vol. II at Tab 9. The superintendent responded by voicemail, stating Barnes "seems to be doing well," and explained "[o]nce he completes all of his required programming, we'll probably give him … the Department of Corrections' recommendation for parole." *Id.* at Tabs 10–11 (containing an audio recording of the voicemail message and a written transcript thereof). Finally, Barnes remained misconduct-free through August 2011, as he had been since 1993, and as he continues to be today. *See* Vol. I at 61–64.

The Board received no new letters opposing reparole before its September 2011 interview of Barnes. Barnes' LSI–R score was assessed as 28—an increase of five points since his assessment seven months earlier, placing him in a high-medium risk category.[22]

21. The remaining notes on that page were made by Donald as she reviewed the file before the interview began. *See* Vol. II at Tab 3, p. 27. Her interview notes begin with a line that is crossed out, but appears to say "good interview." Vol. I at 18. She acknowledged she may have written those words, but crossed them out because it was a mistake. Vol. II at Tab 3, p. 64.

22. The record contains little information about how the LSI–R score is calculated, or why it might vary so much in such a short time. Board officials were unable to justify it. *See* Vol. II at Tab 3, p. 123 (Donald unable to explain how score sheet for LSI–R works); *see also id.* at Tab 4, p. 21, 25 (hearing examiner Shultz notes pos-

*Id.* at 31. He retained his score of 6 on the OVRT, remaining at a medium risk level. *Id.* at 3. As in 2004, 2007, 2009, and early 2011, the parole guidelines suggested reparole based on Barnes' score of 5. *Id.* at 5. Despite the superintendent's assurances to Barnes' counsel, however, the DOC voted in August 2011 not to recommend reparole. *Id.* at 26. Once again, the vote turned solely on the superintendent's "no" vote, which he again based on Barnes' H- and Z-code classifications—factors he had never mentioned in his telephone message to Barnes' counsel, and which the DOC had not cited as a reason not to parole Barnes until less than a year earlier. *Id.; see* Vol. II at Tabs 10–11. The other nine DOC representatives unconditionally supported reparole, noting Barnes had completed the violence prevention program, had no misconducts, had complied with the Board's previous decision, and "shows remorse." Vol. I at 26.

An updated psychological evaluation described Barnes as "polite," "cooperative," aware "of his own feelings, ideas, and motivations," and able "to appreciate the consequences of his past and future decisions and actions." *Id.* at 28. The evaluator further noted Barnes called his shooting of Officer Barclay his "deepest regret and shame," but suggested Barnes' refusal to accept responsibility for the officer's death—after Barnes had been acquitted of murder—revealed "a lack of victim empathy and removal of blame for a decline in the quality of life of his victim." *Id.* at 28.1. The report identified numerous "risk attenuators," *id.* at 29, including Barnes' acceptance of responsibility for his crimes, his "responsible lifestyle changes," his employment prospects, his ties and support in the community, and his ability to identify risk factors and articulate lessons learned in the violence prevention program, *id.* at 29.1.

On September 14, 2011, Barnes was interviewed by Board member Green and hearing examiner Carol Shultz. *Id.* at 5–13. Green's notes are the only record of the interview. *Id.* at 6–7; *see* Vol. II at Tab 4, p. 7. Besides

sibility of inconsistent LSI–R scores based on agent interpretation of questions).

summarizing the information in Barnes' parole file, Green noted Barnes' explanation for his technical parole violations and said he "acknowledges breaking rules is like reoffending," and "acknowledges his serious criminal history." Vol. I at 6. Green observed Barnes lacked morals and had poor judgment, but that he admitted to shooting at police and violating parole. *Id.* at 7. He also documented Barnes' explanation that, after his final misconduct in custody in 1993, he had an "epiphany" and realized he would die in prison unless he changed his behavior. *Id.* Finally, Green noted Barnes had worked when released before, and wanted to return to work if released again. *Id.*

Nevertheless, on October 19, 2011, the Board denied Barnes reparole a fourth time, citing:

- His "risk and needs assessment indicating [his] level of risk to the community";
- His "prior unsatisfactory parole supervision history";
- His "lack of remorse for the offense(s) committed"; and
- "The negative recommendation made by the prosecuting attorney."

*Id.* at 1. The Board notified Barnes he could make his fifth application for reparole one year later, and that the following considerations would be relevant at that time: (1) whether the DOC recommended parole; and (2) his conduct record. *Id.*

And so Barnes, now 75 years old, *id.* at 42, remains in prison.

## V. *Habeas Proceedings*

On May 9, 2011, after he was denied reparole for the third time, Barnes filed a counseled habeas petition. *See generally* Pet. Writ Habeas Corpus, *Barnes v. Wenerowicz,* No. 11–3058 (E.D.Pa. May 9, 2011). Barnes filed a memorandum of law thereafter, Respondents filed a brief, and Barnes replied. Barnes then amended his petition and filed a supplemental brief with exhibits after the Board issued its fourth denial of reparole.[23]

**23.** When the Board initiated its fall 2011 review of Barnes for reparole, Barnes asked that his

*See generally* Am. Pet. Writ Habeas Corpus, *Barnes v. Wenerowicz,* No. 11–3058 (E.D.Pa. Nov. 7, 2011) [hereinafter Petition]. Barnes' request for discovery, which Respondents did not oppose, was granted on November 8, 2011. *See* Order, *Barnes v. Wenerowicz,* No. 11–3058 (E.D.Pa. Nov. 8, 2011). After Respondents produced relevant portions of Barnes' parole file and Barnes deposed Green, Donald, and Shultz—the decision-makers for Barnes' March and October 2011 parole denials—the parties submitted supplemental briefs and a stipulated appendix of evidence related to Barnes' claims. *See* Pet'r's Post–Disc. Mem. Law Supp. Pet. Writ Habeas Corpus, *Barnes v. Wenerowicz,* No. 11–3058 (E.D.Pa. Jan. 4, 2012) [hereinafter Pet'r's Br.]; Vols. I–II; Commw. Defs.' Suppl. Mem. Law Opp'n Pet. Habeas Corpus, *Barnes v. Wenerowicz,* No. 11–3058 (E.D.Pa. Jan. 20, 2012) [hereinafter Resp'ts' Br.]; Pet'r's Reply Mem. Law Resp. Resp'ts' Exhaustion Arg., *Barnes v. Wenerowicz,* No. 11–3058 (E.D.Pa. Jan. 27, 2012).

Barnes alleges a single constitutional violation. He claims he is incarcerated because of "[t]he Board's arbitrary, pretextual, and vindictive denial of [his] parole application[s]," which he alleges "violates his substantive due process rights." Petition at Attachment pp. 1, 4; *see also* Pet'r's Br. at 1–2. He cites the Board's ever-changing reasons for denying him reparole, the Board's recent reliance on unchanging factors that were present years ago when he was twice granted parole, and the Board's reliance on letters from a "vindictive" prosecutor who Barnes claims is willfully ignoring the jury's acquittal. *See* Pet'r's Br. at 34–49.

Respondents urge me to dismiss Barnes' due process claim because he failed to raise it in state court before seeking relief here. *See* Resp'ts' Br. at 2–9. On the merits, Respondents suggest I must defer to the Board's determinations, which, Respondents suggest, were each based on statutorily permissible factors that are supported by the record. *Id.* at 9–21. I disagree.

habeas proceedings be stayed until the Board rendered its decision.

## DISCUSSION

### I. *Exhaustion* [24]

A federal court generally may not grant habeas relief to a state prisoner unless the prisoner has fully exhausted available state court remedies. 28 U.S.C. § 2254(b); *Cullen v. Pinholster,* —— U.S. ——, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011); *Cone v. Bell,* 556 U.S. 449, 129 S.Ct. 1769, 1779, 173 L.Ed.2d 701 (2009); *O'Sullivan v. Boerckel,* 526 U.S. 838, 842, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Nara v. Frank,* 488 F.3d 187, 197 (3d Cir. 2007); *Slutzker v. Johnson,* 393 F.3d 373, 379 (3d Cir.2004). A state prisoner must complete "the [s]tate's established appellate review process" to "give the state courts one full opportunity to resolve any constitutional issues." *O'Sullivan,* 526 U.S. at 845, 119 S.Ct. 1728; *Nara,* 488 F.3d at 197; *see Cone,* 129 S.Ct. at 1779; *see also Woodford v. Ngo,* 548 U.S. 81, 92, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

A petitioner "shall not be deemed to have exhausted the remedies available ... if he has the right under the law of the [s]tate to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c). This total exhaustion doctrine is rooted in the tradition of comity: the state must be given the "initial 'opportunity to pass upon and correct' alleged violations" of the petitioner's constitutional rights. *Picard,* 404 U.S. at 275, 92 S.Ct. 509; *accord O'Sullivan,* 526 U.S. at 844–45, 119 S.Ct. 1728. Where a petitioner raises a constitutional challenge to a decision denying him parole in Pennsylvania, however, there is often no available state court remedy. *See DeFoy,* 393 F.3d at 443–45 (noting "a hesitance on the part of the Pennsylvania Supreme Court to permit a writ of mandamus to review the denial of parole"); *Coady v. Vaughn,* 564 Pa. 604, 770 A.2d 287, 290 (2001) ("[M]andamus will not lie where the substance of the board's discretionary action is the subject of the challenge."); *Rogers v. Pa. Bd. of Prob. & Pa-*

---

**24.** Barnes' habeas petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2241 et seq.

*role*, 555 Pa. 285, 724 A.2d 319, 322 (1999) (state courts "do not have statutory jurisdiction to conduct appellate review" of a Board decision); *Weaver v. Pa. Bd. of Prob. & Parole*, 688 A.2d 766, 774–77 (Pa. Commw.Ct.1997) (en banc) (state courts cannot entertain appeals, requests for mandamus, or habeas petitions challenging parole denials by the Board).

■ Only one class of claims arising from parole denials are subject to mandamus review in Pennsylvania: violations of the Ex Post Facto Clause. *See Parker v. Kelchner*, 429 F.3d 58, 61 (3d Cir.2005); *DeFoy*, 393 F.3d at 445; *Coady*, 770 A.2d at 290. Such claims must, therefore, be exhausted before they are properly raised in federal habeas proceedings. *Parker*, 429 F.3d at 61–64. For all other federal constitutional claims, however, there is no need to pursue relief in the Pennsylvania state courts before filing a federal habeas petition.[25] *DeFoy*, 393 F.3d at 445.

■ Because Barnes' sole challenge to his reparole denials is based on the substantive component of the Due Process Clause, he

was not required to petition the state courts for a writ of mandamus to satisfy AEDPA's exhaustion requirement. *Id.*

## II. Substantive Due Process

Our society has long viewed murder as a horrendous crime meriting severe punishment. *See* Exodus 20:13 ("Thou shalt not kill."); Leviticus 24:17 ("And he that killeth any man shall surely be put to death."); *see also Kennedy v. Louisiana*, 554 U.S. 407, 438, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008) (although nonhomicide crimes against individuals "may be devastating in their harm, … 'in terms of moral depravity and of the injury to the person and to the public,' … they cannot be compared to murder in their 'severity and irrevocability'" (quoting *Coker v. Georgia*, 433 U.S. 584, 598, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977))). This is especially so where the victim is a law enforcement officer sworn to protect the citizenry. *See Roberts v. Louisiana*, 431 U.S. 633, 636, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977) ("[T]he fact that the murder victim was a peace officer performing his regular duties may be regarded

---

**25.** Respondents suggest this area of exhaustion law is complicated and confusing. They claim *DeFoy* is at odds with an earlier decision, *Burkett v. Love*, 89 F.3d 135 (3d Cir.1996), and that the Pennsylvania courts regularly entertain substantive due process claims arising from parole denials. *See* Resp'ts' Br. at 4–9. I disagree.

*Burkett* predicted the Pennsylvania courts would permit review of parole denials on direct appeal, mandamus, or habeas corpus. 89 F.3d at 142. The en banc Pennsylvania Commonwealth Court, however, promptly disagreed. *See Weaver*, 688 A.2d at 771–72 ("After careful consideration, we do not believe that the remedies suggested in *Burkett* are available to a prisoner who has been denied parole based upon an unconstitutional factor."). Neither that court sitting en banc, nor the Pennsylvania Supreme Court, has stated otherwise. *Cf. Coady*, 770 A.2d at 290 (no mandamus review of parole denials except where ex post facto claims are raised); *Rogers*, 724 A.2d at 322 (no direct appellate review of parole denials).

Although panels of the Commonwealth Court have occasionally considered substantive due process claims raised by petitioners challenging parole denials, those claims were often pendant to ex post facto claims. *See Nieves v. Pa. Bd. of Prob. & Parole*, 995 A.2d 412, 418 (Pa. Commw.Ct.2010); *Dodgson v. Pa. Bd. of Prob. & Parole*, 922 A.2d 1023, 1026 (Pa. Commw.Ct.2007); *see also Lusik v. Saurers*, No.

11–1560, 2011 WL 3819731, at *2 (E.D.Pa. Aug. 16, 2011).

The remaining cases cited by Respondents involve: a statutory defect in a Board decision denying parole, *see Voss v. Pa. Bd. of Prob. & Parole*, 788 A.2d 1107, 1111 (Pa. Commw.Ct.2001) (denial issued without stating reasons as required by statute); the dismissal of a petition for mandamus based on failure to state a claim after noting such a petition could not be used "to direct the Board [to] re-parole or release" the petitioner, *see Nickson v. Pa. Bd. of Prob. & Parole*, 880 A.2d 21, 23 (Pa. Commw.Ct.2005); and Commonwealth Court panels that were not empowered to alter the en banc court's holding in *Weaver*, *see Cummings v. Pa. Bd. of Prob. & Parole*, No. 245 M.D. 2009, 2009 Pa. Commw. Unpub. LEXIS 559, at *6, *14 (Pa.Commw.Ct. Oct. 7, 2009) (unpublished) (sustaining Board's objection based on assertion discretionary acts could not be challenged via mandamus); *Wilson v. Pa. Bd. of Prob. & Parole*, 942 A.2d 270, 274 (Pa.Commw.Ct.2008) (including no discussion of jurisdiction, but granting preliminary objections and dismissing petition).

Accordingly, none of the cases Respondents cite change the fact that the Third Circuit, the Pennsylvania Supreme Court, and the en banc Pennsylvania Commonwealth Court unambiguously have held petitioners challenging parole denials may not pursue substantive due process claims in state court.

as an aggravating circumstance. There is a special interest in affording protection to these public servants who regularly must risk their lives in order to guard the safety of other persons and property.").

Barnes, however, is not a murderer, and punishing him as though he were violates the Due Process Clause.

### A. Legal Framework

■ "The core concept of due process is protection against arbitrary government action." *Evans v. Sec'y Pa. Dep't of Corr.,* 645 F.3d 650, 658 (3d Cir.2011) (citing *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). "The substantive component of the Due Process Clause limits what government may do regardless of the fairness of procedures that it employs." *Boyanowski v. Capital Area Intermediate Unit,* 215 F.3d 396, 399 (3d Cir. 2000); *accord Evans,* 645 F.3d at 659; *Newman v. Beard,* 617 F.3d 775, 782 (3d Cir. 2010). Substantive due process rights are violated by "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Lewis,* 523 U.S. at 846, 118 S.Ct. 1708.

■ To assess a substantive due process claim, I must first "define the exact contours of the underlying right said to have been violated." *Leamer v. Fauver,* 288 F.3d 532, 546 (3d Cir.2002). Here, that right is "a liberty interest ... in not being denied parole for arbitrary or constitutionally impermissible reasons." *Block v. Potter,* 631 F.2d 233, 236 (3d Cir.1980); *see also Burkett,* 89 F.3d at 140 (noting "a state may not bar parole in retaliation for a prisoner's exercise of his constitutional rights").

■ Executive action violates substantive due process "only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *Lewis,* 523 U.S. at 847, 118 S.Ct. 1708 (quoting *Collins v. Harker Heights,* 503 U.S. 115, 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)); *see Hunterson v. DiSabato,* 308 F.3d 236, 246–47 (3d Cir.2002) (requiring "something more egregious" than unreasonable, and describing standard as "conscience shocking" or "delib-

erately indifferent"). "What is shocking to the conscience inevitably depends to a degree on whose conscience is being tested; so, to put it mildly, the standard has some give in it." *Evans,* 645 F.3d at 660; *see Lewis,* 523 U.S. at 850, 118 S.Ct. 1708 ("Rules of due process are not ... subject to mechanical application in unfamiliar territory."). Assessment of substantive due process claims is necessarily context-specific. *See Lewis,* 523 U.S. at 850–51, 118 S.Ct. 1708 (requiring consideration of environment in which action is taken); *Evans,* 645 F.3d at 660 (standard is flexible and context-sensitive).

■ Our legal system has long accorded a jury's verdict acquitting a criminal defendant a high degree of sanctity, insulating it from nearly every post-trial attack. *See Yeager v. United States,* 557 U.S. 110, 129 S.Ct. 2360, 2368, 174 L.Ed.2d 78 (2009) (jury's acquittal "represents the community's collective judgment regarding all the evidence and arguments presented to it," and "its finality is unassailable"). Because a jury's acquittal is "a final determination against the Government on the question of" a defendant's guilt, "it is impermissible for ... prison administration to determine otherwise and punish [a] prisoner for an offense as to which he has been acquitted." *Rusher v. Arnold,* 550 F.2d 896, 897–98 (3d Cir.1977); *see also Burks v. United States,* 437 U.S. 1, 16, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) (a jury's verdict must be afforded "absolute finality"). Similarly, a prisoner may not be punished—whether by prison officials, local prosecutors, or those making decisions about his parole—for exercising a right guaranteed by the Constitution, including the right to demand a jury trial. *See United States v. Goodwin,* 457 U.S. 368, 372, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982) ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort.").

■ A federal habeas court may not "second-guess" a parole board, and may grant relief in a case such as this one only "if there is [no] basis for the challenged decision." *Hunterson,* 308 F.3d at 246 (citing *Coady,* 251 F.3d at 487). I must, however, review Barnes' claim de novo, as it was not first presented in state court, and typical AEDPA

deference is not required. *Id.* at 245 n. 9; *cf.* 28 U.S.C. § 2254(d) (requiring deference to state court adjudications of constitutional claims on the merits). In doing so, I remain mindful of the Board's expertise in this area, provided that its decision is based on the evidence. Similarly, I am mindful of a prosecutor's unique perspective on an offender, provided the view is based on the law and evidence, as opposed to sheer vindictiveness.

### B. *Analysis*

Barnes broadly attacks nearly every aspect of the Board's 2009 and 2011 parole denials. He claims the stated reasons are pretextual and are intended to mask "the Board's plain intent ... to deny [him] parole regardless whether he meets all the requirements for obtaining parole, including those imposed by the Board." Pet'r's Br. at 35–36. He argues many factors considered by the Board, including the H- and Z-codes cited by the prison superintendent, are not legitimate reasons to deny parole, as they existed in 2004 and 2007 when he was granted parole. *Id.* at 40–41. Barnes contends his technical parole violations are the only factor—besides the murder charge of which he was acquitted—that changed between the Board's 2007 decision granting parole and the subsequent decisions denying it. *Id.* at 41–42. And finally, he faults the Board for relying on

factually inaccurate and facially vindictive letters from the prosecutor. *Id.* at 44–49.

Respondents defend each of the Board's stated reasons, blame Barnes for lacking remorse and victim empathy, and characterize Barnes' brief as "minimiz[ing] and seek[ing] to rationalize his failure to comply with parole conditions in the summer of 2007." [26] Resp'ts' Br. at 12–20.

I conclude that by October 2011, the Board's actions rose to the level of a substantive due process violation.[27]

Barnes arrived for his September 14, 2011 interview with Green and Shultz having plainly complied with two of the Board's three previous stipulations: he had completed a violence prevention program and had maintained a clear conduct record. Vol. I at 40, 61; *see id.* at 14. He lacked only the DOC's recommendation for parole, but that was based solely on the superintendent's vote, which was based solely on program codes that had been assigned to Barnes before he was paroled in 2007.[28] *Id.* at 26, 274. The parole guidelines suggested parole, as they had the last two times he was reviewed. *Id.* at 17, 203.1; *see also id.* at 249, 258 (guidelines suggested parole in 2004 and 2007).

■ Nonetheless, Green and Shultz re-

---

26. Respondents go so far—in their brief and at oral argument—as speculating the car keys and cell phone Barnes possessed in August 2007 were "potentially instruments of escape," invoking the specter of his escape attempts from the 1980s and earlier. Resp'ts' Br. at 14. No documents reveal that this view was held by any individual recommending or voting on Barnes' parole applications, and I find it defies logic.

27. Barnes suggests a pattern of arbitrariness began with the Board's 2009 parole denial, which followed the first letter from the ADA in the murder case. Although the 2009 denial did not constitute a constitutional violation, it set the stage for the Board's escalating arbitrariness that ensued. *See Evans*, 645 F.3d at 660 (noting "the context-sensitivity of the [shocks-the-conscience] standard").

  The 2008 denial, however, was not arbitrary in any sense, and Barnes does not attack it. Like the 2004 and 2007 decisions granting parole, the 2008 denial did not rest on Barnes' decades-old criminal record and escape history, nor did it

cite concern about his risk to the community or his feelings about his past crimes or their victims. It was based on the pending murder charge and Barnes' failure to complete "Thinking for a Change." Vol. I at 334.

28. The superintendent's reliance on the DOC program codes is troubling for several reasons. First, the codes had been assigned to Barnes many years earlier, before he was paroled in 2007. The H-code was based on escape attempts that ceased in the 1980s or by 1993, at the latest. Vol. I at 457; *see id.* at 64. The Z-code was based on Barnes' medical condition, and Respondents now admit it was an improper consideration. *Id.* at 27.1. Second, the superintendent's voicemail message to Barnes' counsel stated the only factor he believed would impact the DOC's recommendation was whether Barnes completed required programs (which he did). Vol. II at Tabs 10–11. Finally, the record reveals the ADA's June 9, 2010 letter stating his intent to oppose parole was forwarded to the superintendent. Vol. I at 241–42.

fused parole.[29] *Id.* at 13. The four factors cited in their October 19, 2011 decision establish the arbitrariness of the denial.

### 1. *Barnes' Parole Supervision History*

One of the four reasons Green and Shultz cited to justify reparole denial was Barnes' "prior unsatisfactory parole supervision history." *Id.* at 1. That unsatisfactory history, however, objectively consists of direct violations he committed in the 1950s, 1960s, and 1980s, and his possession of car keys and a cell phone in 2007. *See id.* at 50–52. When on pre-release in 2005 and 2006, Barnes had a "satisfactory adjustment," *id.* at 61, and was returned to prison only for health reasons, *id.* at 67. The file contains letters from Barnes' CCC, Eastern State Penitentiary, and a Temple University professor describing Barnes' positive adjustment to pre-release. *Id.* at 555–58. Although Barnes' technical parole violations certainly merited a serious response, the Board had concluded in October 2007 that six months of backtime sufficed. *Id.* at 336.

In focusing on Barnes' prior parole failures, the October 2011 denial, like the 2009 decision, rested on decades-old, unchanging factors.[30] *See Mickens–Thomas v. Vaughn,* 355 F.3d 294, 307–08 (3d Cir.2004) (reliance on "historical information not previously relied upon" appeared "designed to achieve a non-parole decision" and raised inference of pretext and vindictiveness). As Green conceded, the only relevant changes between

2007 when Barnes was granted parole and the 2009 denial were his technical parole violations and the new murder charges. Vol. II at Tab 2, pp. 105–06. Following Barnes' acquittal, the only remaining change since his 2007 parole was his admission to possessing car keys and a cell phone.

Respondents, through counsel, conceded at oral argument that a time would come when those technical violations no longer justified parole denial. That time has long passed.

### 2. *Remorse*

As another basis for its denial, the Board cited Barnes' "lack of remorse for the offense(s) committed." Vol. I at 1. Observations regarding Barnes' remorse, or his lack thereof, appear throughout the record. In 2004, a Board interviewer noted Barnes showed "obvious remorse." *Id.* at 250. In 2007, the Board recognized Barnes' "stated remorse" as a basis for granting parole.[31] *Id.* at 320. The Board saw no need to revisit the issue of remorse in 2008. *Id.* at 334, 656. A 2009 psychological evaluation, conducted while the murder charge was pending, noted Barnes expressed regret but "little actual remorse," *id.* at 166, and the Board noted his lack of remorse as a basis for denying parole that year, *id.* at 332. Barnes' remorse was not examined in March 2011, *id.* at 14, 18, but it was resurrected as a barrier to parole six months later, *id.* at 1. This occurred despite the fact that Barnes' most recent psychological evaluation noted he described the 1966 shooting as a source of "deep[ ]

**29.** After reviewing the videotaped depositions of Green and Shultz, I find their explanations lack credibility because their rationale for parole denial is not supported by the uncontested evidence, and because they refused to reconcile or acknowledge inconsistency in the Board's series of parole assessments since 2004. Moreover, Shultz appeared guarded and often clinical in her responses. Green often appeared evasive, *see* Vol. II at Tab 2, pp. 90, 143 (refusing to state how long an average parole interview lasts, or whether six months between reparole reviews was a short time), and he spent significant portions of the deposition paging through documents from Barnes' parole file (even when he was not being asked about them, and despite the fact he testified he had reviewed the entire file when preparing for the deposition, *id.* at Tab 2, p. 8). His answers were often vague or not entirely responsive, and he appeared to have limited independent recollection of his three in-

terviews with Barnes. *See, e.g., id.* at Tab 2, pp. 63–64 (when asked whether he finds it significant to know whether an inmate has been crime-free for a period of time, Green asked for the question to be repeated, then answered, "In this case, I look at the total body of activity"); *id.* at Tab 2, pp. 95–96 (when asked what specific comments Barnes made to indicate a lack of remorse, Green gave at least two non-responsive answers, then admitted he could not "remember in any detail").

**30.** In 2009, the Board also cited Barnes' history of escape attempts (in the 1980s, and ending in 1993, at the latest). Vol. I at 332.

**31.** During his deposition, Green dismissed the Board's 2004 and 2007 findings as "a different Board action." Vol. II at Tab 2, p. 99.

regret and shame," and only criticized his denial of responsibility for the officer's death. *Id.* at 28.1. The Board, however, may not penalize him for denying such responsibility. *See Rusher,* 550 F.2d at 897–98. Neither can the Board or the ADA punish Barnes for exercising his constitutional right to defend himself against the murder charges at trial, rather than entering a guilty plea. *See Goodwin,* 457 U.S. at 372, 102 S.Ct. 2485. The jury's acquittal must be afforded "absolute finality." *Burks,* 437 U.S. at 16, 98 S.Ct. 2141.

Neither Green nor Shultz could cite to specific things that Barnes said during his interview that supported their belief he failed to show remorse. *See, e.g.,* Vol. II at Tab 2, pp. 95–97 (Green unable to recall Barnes' comments showing lack of remorse "in any detail"); *id.* at Tab 4, pp. 45–47 (Shultz could not recall specific questions about remorse, or specific answers Barnes gave about Officer Barclay or any other victim); *cf. id.* at Tab 3, p. 85 (Donald relied entirely on her notes about the March 2011 denial, admitting "I don't recall the actual interview").

Moreover, Green and Shultz both claimed Barnes' prior expressions of remorse were irrelevant if he did not express it during his interview with them. *See id.* at Tab 2, pp. 94–95; *id.* at Tab 4, pp. 47–48. They also acknowledged they were not concerned with ensuring the Board issued consistent decisions when reviewing the same inmate. *See id.* at Tab 2, pp. 103–04 (Green testified consistency is not a factor he considers, then admitted it could be considered, then could not recall whether he considered it in Barnes' case); *id.* at Tab 4, pp. 86–87 (Shultz does not "seek to be consistent" with prior Board determinations, stating "each interview is different"). That is the essence of arbitrariness.

### 3. Barnes' Risk Assessments

A third factor cited by the Board was Barnes' "risk and needs assessment indicat-

ing [his] level of risk to the community." Vol. I at 1. This factor is unsupported by the file documents upon which Green and Shultz purportedly relied.

Barnes' LSI–R score, although higher than it had been six months earlier, was lower than when he was paroled in 2004 and 2007. *Id.* at 31, 169, 280, 550. His OVRT classification was the same as it had been in March 2011, and lower than in 2009. *Id.* at 3, 16, 663. His psychological evaluation recounted results from other risk assessment tools that scored Barnes in low ranges for "criminal-related sentiments" and "hostile attributions." *Id.* at 29. Moreover, the risk assessments are accounted for in the parole guidelines, which had consistently suggested release since 2004, except when Barnes faced a murder trial. *Id.* at 5, 17, 203.1, 249, 258, 655. Shultz, at her deposition, did not acknowledge Barnes' risk assessments when listing her "main concerns" for denying parole. *See* Vol. II at Tab 4, p. 43 (listing lack of remorse and victim empathy, extensive and violent criminal history, and parole history). She also admitted such scores might be impacted not only by an inmate's responses, but also by an evaluator's interpretations of the questions administered during the risk assessment. *Id.* at Tab 4, p. 21, 25.

In 2009, the Board had similarly supported its reparole denial by pointing to two factors referencing Barnes' risk assessments, even though his most recent LSI–R score then was at an all-time low, and the Board's own guidelines recommended parole. Vol. I at 203.1, 332, 385; *see also id.* at 334, 463 (Barnes' 2008 LSI–R score was higher than his 2009 score, but was not cited as a basis for denying parole in 2008). Although a 2009 OVRT placed Barnes in a "high risk" category, the record lacks any explanation of the analysis involved in reaching that result, and the Board members who were deposed could provide none.[32] *See, e.g.,* Vol. II at Tab 2,

---

32. Although Barnes had completed "Thinking for a Change," and although it is undisputed he had committed no new act of violence in decades, the 2009 decision cited a need to participate in an additional program focused on violence prevention. Vol. I at 334. Green explained he added this requirement based on Barnes' OVRT score, despite the "low risk" LSI–R result, and despite Green's inability to explain the process used to prepare the OVRT. Vol. II at Tab 2, p. 81–82. DOC records reflect Barnes had previously completed at least nine other prescriptive programs, including "Stress and Anger Management,"

pp. 53–57 (Green unsure of range of possible scores, did not identify "the several sources of input" used to prepare an OVRT).

### 4. *Prosecutor's Objection*

Finally, Green and Shultz relied on the ADA's November 2010 letter opposing Barnes' reparole despite the jury's conclusion he was not guilty of murder.[33]  Vol. I at 1. This letter impermissibly led the Board to punish Barnes based on acquitted conduct. *See Rusher*, 550 F.2d at 897–98.  Both Green and Shultz reviewed the ADA's letter and admitted it played a significant role in their decision-making.  *See* Vol. II at Tab 2, pp. 152–55 (letter was "compelling" to Green because it provided "a substantial degree of input and objection," and expressed a "strong objection" to parole); *id.* at Tab 4, p. 102 (letter was "compelling" to Shultz). However, neither of them considered that the letter's author was the prosecutor who had lost the murder case against Barnes.[34]  *Id.* at Tab 2, pp. 156–57 (Green did not consider motive of prosecutor); *id.* at Tab 4, pp. 110–15 (Shultz did not know who prosecutor was; thought he had prosecuted Barnes' robbery cases).  Indeed, little, if any, consideration was given to Barnes' acquittal in either of the Board's 2011 reviews.  *See id.* at Tab 3, p. 165 (Donald did not consider the jury's verdict in March 2011); *id.* at Tab 4, pp. 46, 113 (Shultz considers acquittals but penalized Barnes for not expressing feelings about shooting Officer Barclay).

Further, the letter featured a false premise, which should have been apparent to Green and Shultz based on their review of Barnes' file.  The letter falsely claimed Barnes had not served his full sentence for shooting Officer Barclay, Vol. I at 239, a fact belied by dozens of documents in Barnes' file describing his current sentences, *see, e.g., id.* at 43–44, 72, 104–05.  Moreover, the ADA's personal plea that Barnes "should spend the rest of his life in prison," *id.* at 240, demanded that the Board impose the sentence the ADA failed to obtain after the jury acquitted Barnes of murder.

Ultimately, none of the four factors cited by the Board—whether considered individually, or in combination—can constitute a constitutionally permissible basis to deny Barnes parole under the unique circumstances presented here.  After careful review, the evidence establishes Barnes would not be in prison today had he not been charged with—and acquitted of—murder.  He has served more than four years in custody since his 2007 arrest—an amount of time disproportionate to the technical parole violations he committed.

His continued imprisonment is unconstitutional.

### C. *Appropriate Relief*

■  Barnes has asked for an order granting his immediate release, rather than an order requiring the Board to conduct a fifth reparole review.  Pet'r's Br. at 50; Peti-

---

"Victim Awareness," and "Character Development."  Vol. I at 65.

**33.**  The Board cited the ADA's letter as a basis for its denial in October 2011 even though it had considered the letter in March 2011 and decided not to list it as a determinative factor in its decision at that time—a decision by a panel that included Green as well.  Vol. I at 21–22, 25.

**34.**  The same was true of Donald, who considered Barnes for reparole in March 2011 along with Green.  *See* Vol. II at Tab 3, p. 77 (ADA's description of Barnes was "significant"); *id.* at Tab 3, pp. 62, 77 (Donald considers letters from any prosecutors regardless of nature of contact with inmate, and did not know letter was written by ADA who lost homicide trial).

Similarly, all three Board members reviewing Barnes for reparole in 2011 relied on the DOC's

negative parole recommendation in their decision-making.  *See* Vol. I at 14, 21, 25 (Green and Donald cited the DOC's recommendation as a basis for denying parole in March 2011); Vol. II at Tab 4, pp. 80–84 (Shultz noted the DOC's recommendation and considered "everything that [she] look[ed] at").  However, at least two of them did so without any understanding of the basis for the recommendation—i.e., what the code designations meant or whether they were proper considerations.  *See* Vol. II at Tab 3, pp. 49–51 (Donald did not know what either code meant, did not question them, and was not concerned with the reasons for the superintendent's vote); *id.* at Tab 4, pp. 81–84 (Shultz did not know why Barnes had the Z-code, and considered the H-code knowing it was based on Barnes' behavior in the '80s and early '90s); *cf. id.* at Tab 2, pp. 122–23 (at his deposition, Green did not know why Barnes had the Z-code).

tion at 18. Although that is an extreme remedy, it is necessary here. *See Mickens–Thomas,* 355 F.3d at 309–10 (noting previous reluctance to intrude on Board's discretionary powers, but doing so where facts suggested, inter alia, "bad faith" or an "inference of retaliation or vindictiveness").

Barnes is 75 years old, with various documented medical concerns. *See* Vol. I at 42, 60. He has now served more than fifty-three months on technical parole violations that were initially assessed as warranting only six months of backtime. *Id.* at 336. He has been charged with murder, spent years preparing for trial, and was acquitted more than a year and a half ago. *Id.* at 728–45. The actions of the Board, the DOC (through the prison superintendent), and the ADA have forced Barnes to endure a shocking pattern of arbitrary and irrational expectations, requirements, and parole denials over the past two years.

Immediate release is the only remedy that will fully redress the constitutional violation at hand and ensure Barnes is subjected to no further arbitrariness or vindictiveness. I recommend ordering him paroled forthwith.

Accordingly, I make the following:

### RECOMMENDATION

AND NOW, this 7th day of February 2012, it is respectfully recommended that the petition for a writ of habeas corpus be GRANTED, and Barnes be ordered released on parole forthwith. The respondents may file objections to this Report and Recommendation within fourteen days after being served with a copy thereof. *See* Local Civ. Rule 72.1. Failure to file timely objections may constitute a waiver of any appellate rights. *See Leyva v. Williams,* 504 F.3d 357, 364 (3d Cir.2007).